# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles R. Norgle | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6672 | **DATE** | 2/4/2003 |
| **CASE TITLE** | Perez vs. Norwegian-American Hospital, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendants' motion for summary judgment [38-1] granted. See attached.

*Charles Norgle*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** | |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | 2-6-03 | | |
| X | Docketing to mail notices. | | date docketed | 96 | |
| X | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VALENTINA PEREZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 00 C 6672 |
| | ) | HONORABLE CHARLES R. NORGLE |
| NORWEGIAN-AMERICAN HOSPITAL, | ) | |
| IVAN RIVERA, and STEVE DAHL | ) | |
| | ) | **DOCKETED** |
| Defendants. | ) | FEB 6 2003 |

**OPINION AND ORDER**

CHARLES R. NORGLE, SR., District Judge

Before the court is Defendants' motion for summary judgment. For the following reasons, the motion is granted.

## I.  BACKGROUND[1]

Valentina Perez ("Perez") filed suit against her former employer, Norwegian-American Hospital ("NAH"), and former co-workers, Ivan Rivera ("Rivera") and Steve Dahl ("Dahl"), based on events occurring between January and September of 2000. Specifically, Perez' complaint contains five counts: Count I, sexual discrimination under 42 U.S.C. § 1981(a); Count II, failure to promote under 42 U.S.C. § 2000e-2; Count III, retaliation under 42 U.S.C. § 2000e-3; Count IV, state law intentional battery; and Count V, state law intentional infliction of emotional distress. The distillate of Perez' federal claims, which are brought solely against NAH, are that she had been discriminated against because of her gender, alleging a mosaic of incidents in support of those

---

[1]The court takes the facts from the parties' Local Rule 56.1 statements and accompanying briefs. Disputed facts are noted in the text.

96

claims.

The Department of Public Security ("Security Department") at NAH is responsible for security at the hospital. The Security Department is organized in a para-militaristic hierarchy. Until June 15, 2000, the highest position within the Security Department of NAH was the Director of Security. The Director of Security reported directly to the Chief Operating Officer of NAH, Mary Toma ("Toma"). At all times pertinent to this matter, James Byrnes ("Byrnes") held the position of Director of Security. Byrnes resigned in June of 2000, and thereafter NAH reorganized the structure of the Security Department. The position of Director of Security was eliminated and replaced with the position of Lieutenant. As implemented, the newly created position of Lieutenant reported directly to Toma, and was responsible for general oversight of the Security Department. The Lieutenant position was awarded to Rivera in July 2000.[2]

The remainder of this organizational hierarchy consisted of Sergeants, Corporals[3], and security officers. The security officers were assigned to various posts during their shifts.[4] These security officers were immediately supervised by Corporals, who were the individuals on a shift that would assume responsibility in a Sergeant's absence. The Sergeants had general oversight and responsibility of the shifts to which they were assigned, and in addition, scheduled the work shifts of security officers, relieved security officers during break times, and were also responsible for

---

[2]Rivera was hired by NAH as a security guard in June of 1989. In June of 1992, Rivera was promoted to Sergeant, and remained in that position until his promotion to Lieutenant. Rivera's formal evaluations indicate that he performed his duties well throughout this time.

[3]The position of Corporal was formerly referred to as Officer in Charge.

[4]There were three shifts for security guards: the day shift from 6:30 A.M. to 2:30 P.M.; the P.M. shift from 2:30 P.M. to 10:30 P.M.; and the night shift from 10:30 P.M. to 6:30 A.M..

2

checking the mechanical security systems in place at NAH.

In July of 1989, Perez was hired by NAH as a security officer in the Security Department. In 1993, Perez was promoted to Officer in Charge.[5] Then in late 1994 or early 1995, Perez was promoted to the position of Sergeant. Perez' formal evaluations indicate that she performed her duties well throughout this time.

In 1997, Dahl, a DuPage County Sheriff Deputy, began working as a consultant to NAH, in response to gang-related crime problems at the hospital. Dahl's responsibilities included hiring additional off-duty Chicago Police Department officers to serve as armed security guards for NAH. Dahl and these armed security guards worked in the emergency room during the hours of 6:00 PM to 2:00 AM. These off-duty police officers operated under a separate chain of command from the unarmed security guards.

The genesis of Perez' sexual discrimination claims can be traced to an incident that is alleged to have occurred on January 10, 2000. On that date, Perez alleges that as she exited an elevator, Dahl hit her on the buttocks with a schedule book that he was carrying. Dahl was waiting to enter the elevator with Byrnes when this incident is alleged to have occurred. Perez indicated that she suffered pain as a result of the contact, but "self-treated it," and remained at work for the duration of her shift.

That very day, Perez complained to Byrnes of the incident. The following day, Perez also reported the incident to the Director of Human Resources, Russ Dickow ("Dickow"). In her response to defendants' Local Rule 56.1 statement, Perez states: "Ms. Perez denies that Norwegian

---

[5]The position of Officer in Charge is the equivalent of the position of Corporal. See footnote 3, supra.

conducted any meeting concerning her incident report at any time." (Pl.'s Resp. to Defs.' 56.1 statement ¶ 47.) However, in her deposition, Perez indicates that she did meet with Dickow and Byrnes, and further states that Byrnes indicated that he did not observe the alleged incident. (See Pl.'s Dep. pg. 176-78) Thus, it is undisputed that on January 28, 2000, Perez, Byrnes and Dickow met to discuss the incident. At this meeting, Byrnes indicated that he did not see the alleged incident and that Dahl denied hitting Perez. Despite his denial, Dahl was talked to about the matter and told to act in a professional manner.

Perez states that after the alleged incident, Dahl never again came into physical contact with her, nor did any other employee of NAH. During her deposition, Perez was asked: "Aside from Steve Dahl, was there anyone at the hospital in all the time you worked there who did something hostile or offensive towards you?" Perez responded: "No." This admission seems to contradict the majority of Perez' claims. Yet, Perez alleges that in May and June of 2000, her co-workers "shunned her and isolated her and perpetuated rumors that she would be demoted" after they learned of her complaint against Dahl. In addition, Perez alleges that between July and September of 2000, Dahl would "watch her" and take notes. Sometime in mid-June of 2000, NAH posted a notice of a newly created Lieutenant position, in order to solicit applications. Perez alleges that notice of this position was never posted. However, evidence from other sources indicates that the position was posted. Subsequently, Perez did not apply for this position, and the position was awarded to the only applicant, Rivera, in late June or early July of 2000.

On July 27, 2000, Rivera called Perez to a meeting to discuss her performance, and areas of concern. Rivera drafted a memo that detailed his areas of concern by listing numerous infractions which Perez allegedly committed. As a result of this meeting, Rivera determined that Perez would

4

be transferred to the night shift. Rivera indicated that the reasons for the transfer were because the shift that Perez supervised had the most problems, to allow Perez to improve her performance, and to balance the shifts. Perez alleges that the infractions, which Rivera documented, are false and that they were fabricated solely to discipline her for filing her internal complaint against Dahl. However, once again, Perez admits that she committed a number of the infractions which were detailed in Rivera's memo.

Perez filed three separate claims of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The first claim was filed on July 25, 2000, and contained the allegations of the January 10, 2000 incident, the rumors of her imminent demotion or termination, and the denial of an opportunity for a promotion. The second claim was filed on August 4, 2000, and contained allegations of being retaliated against for filing the first EEOC claim; specifically, that two days after she filed the initial EEOC claim she was transferred to another shift under the supervision of a lower ranking employee. However, it is undisputed that NAH first learned of the EEOC charges on August 9, 2000. The third claim was filed on January 24, 2001, and reiterated the allegations contained in the second claim, and alleged that she had been constructively discharged.

Plaintiff left work on September 19, 2000 and then went on sick leave. Plaintiff did not return to NAH afterwards, and tendered her resignation letter to Rivera and the Human Resources department on November 19, 2000.

Perez filed the present lawsuit on October 26, 2000. Perez bases her sexual discrimination claims on a mosaic of allegations. First, Perez contends that NAH fostered a hostile work environment, as evidenced by: 1) the January 10th incident where Dahl hit her on the buttocks, 2) NAH's failure to investigate the incident, 3) Dahl's actions in watching her and taking notes, and

4) the actions of her co-workers who "shunned her and isolated her and perpetuated rumors that she would be demoted" after they learned of her complaint against Dahl. Second, Perez contends that she was not promoted to the position of Lieutenant, while another male employee with equal or lesser qualifications was awarded the promotion. Third, Perez contends that after the alleged incident on January 10, NAH retaliated against her for reporting the complaint. She indicates that her co-workers ostracized her and perpetuated rumors about her demotion or termination, false allegations of policy violations were made against her, she was transferred to another shift, and this transfer was in effect a demotion because she was forced to report to a subordinate employee. In addition, Perez contends that while she and another male employee were ineligible for "comp time," she was denied "comp time," which was mistakenly given to another male employee.[6] In short, Perez claims that she was constructively discharged, since all of these actions led to a "work environment so uncomfortable that no person could reasonably be expected to endure it."

NAH filed a motion for summary judgment, which the court now addresses.

## II.  DISCUSSION

### A.  Standards for Summary Judgment:

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Factual disputes are 'material' only when they 'might affect the outcome of the suit under the governing

---

[6]Perez cites cases involving the Equal Pay Act, however, does not include such a count in her complaint. In short, Perez has failed to adequately develop this argument, both legally and factually. See United States v. Jones, 224 F.3d 621, 626 (7th Cir. 2000) (noting that an undeveloped argument speaks to its paucity, and refusing to consider the argument). In addition, Perez fails to link this incident into her sexual discrimination arguments based on hostile work environment, failure to promote, and retaliation.

law.'" Oest v. Illinois Dept. of Corrections, 240 F.3d 605, 610 (7th Cir. 2001) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Cornfield v. Consolidated High School District No. 230, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Murphy v. ITT Technical Services, Inc., 176 F.3d 934, 936 (7th Cir. 1999). Thus, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "The days are gone, if they ever existed, when the nonmoving party could sit back and simply poke holes in the moving party's summary judgment motion." Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir. 1990). Further, in deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996).

The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. Fed. R. Civ. P. 56(c); see also Perdomo v. Browner, 67 F.3d 140, 144 (7th Cir. 1995). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also Wolf v. Buss (America) Inc., 77 F.3d 914, 922 (7th Cir. 1996). The choice between reasonable inferences from facts is a jury function. See Anderson, 477 U.S. at 255.

**B.    Sexual Discrimination Claims:**

   **1.    Hostile Work Environment:**

Initially, it must be noted that Count I of Perez' complaint alleges sexual discrimination in

violation of 42 U.S.C. § 1981(a). While, a claim under § 1981 includes the same elements and employs the same analysis and methods of proof as a Title VII claim, see Johnson v. City of Fort Wayne, 91 F.3d 922, 940 (7th Cir. 1996), a claim for sexual discrimination is not cognizable under § 1981. See Friedel v. City of Madison, 832 F.2d 965, 967 fn. 1 (7th Cir. 1987). In Friedel, the Seventh Circuit stated:

> "It is important to note here, . . . that while section 1983 and Title VII reach both sex and race discrimination, claims of sex discrimination are not cognizable under section 1981, e.g., Runyon v. McCrary, 427 U.S. 160, 167, 96 S.Ct. 2586, 2592, 49 L.Ed.2d 415 (1976); St. Louis v. Alverno College, 744 F.2d 1314, 1317 (7th Cir. 1984), and we have so construed plaintiffs' amended complaint. We urge counsel, however, to be more mindful of the distinctions among sections 1981 and 1983 and Title VII; drafting complaints is the business of the bar, not the bench."

Id. With this admonition, this court follows the advice of Friedel, and construes Perez' complaint of sexual discrimination under Title VII, and addresses the motion for summary judgment.

Count I of Perez' complaint alleges that a hostile work environment was created by: 1) the hit on the buttocks by Dahl, 2) NAH's failure to investigate the incident, 3) Dahl's actions in watching her and taking notes, and 4) actions of her co-workers who "shunned her and isolated her and perpetuated rumors that she would be demoted" after they learned of her complaint against Dahl. "To maintain an actionable claim under this theory, an employee must demonstrate that her co-worker or supervisor harassed her *because of* her sex." Hilt-Dyson v. City of Chicago, 282 F.3d 456, 462 (7th Cir. 2002) (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)) (emphasis added). Furthermore, the "harassment must be 'so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment.'" Id. (citing Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998)).

"[A] hostile work environment is one that is 'both objectively and subjectively offensive, one

8

that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" Id. at 463 (citing Faragher, 524 U.S. at 787; Hostetler v. Quality Dining, Inc., 218 F.3d 798, 807 (7th Cir. 2000)). "In determining whether contested conduct actually creates an objectively hostile work environment, a number of factors may be considered including 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. (citing Faragher, 524 U.S. at 787-88, 118 S.Ct. 2275; Hostetler, 218 F.3d at 806). "Title VII does not prohibit all verbal or physical harassment in the workplace." Id. The Seventh Circuit has stated: "Although a bright line does not exist separating innocuous from actionable behavior, this court has noted that isolated and minor incidents of questionable conduct generally will not warrant a conclusion of sexual harassment." Id. (citing Koelsch v. Beltone Elecs. Corp., 46 F.3d 705, 708 (7th Cir. 1995).

The court now addresses whether Perez' claim of a hostile work environment can survive a motion for summary judgment. Perez alleges that Dahl hit her on the buttocks with a schedule book, and the Court accepts that allegation as true for the purpose of this motion.

There can be no doubt that Perez found the incident to be offensive; however, that incident must also be objectively offensive in order to warrant of finding of sexual harassment. Objectively viewed, this one contact, which Perez admitted never occurred again, cannot support a hostile work environment claim.

In Hilt-Dyson, a female police officer alleged that on two occasions her supervisor rubbed her back, each lasting less than one minute, and in addition singled her out during a uniform inspection and stared at her chest. See Hilt-Dyson, 282 F.3d at 463-64. The Seventh Circuit held

that these incidents did not equal an objectively hostile work environment, and were not severe and pervasive. See id.

Viewed along a continuum of sexual harassment, Perez' allegations fall well short of the allegations that were found to be insufficient in Hilt-Dyson. In terms of the severity of the incident, Perez does not describe the incident as having been forceful, nor as having lasting for any longer than a fleeting second of time. In terms of the incident interfering with her work performance, Perez did not seek to be relieved from her shift, but rather self-treated the injury and remained at work. The schedule book touched the winter uniform covering the buttocks of Perez, who was exiting a public elevator. The details of Perez' self-treatment are left to speculation. There were no shouts, screams, calls for assistance, or reactions by the veteran security officer at the time of the contact. Furthermore, Perez has failed to show that the contact on the buttocks was of a sexual nature. See Hilt-Dyson, 282 F.3d at 462 ("an employee must demonstrate that her co-worker or supervisor harassed her *because of* her sex"). Perez does not assert that Dahl made any comments during this incident or acted in a sexually explicit manner. This incident, while certainly unprofessional, if it did in fact occur, may have been no more than an expression of camaraderie amongst the corps of security guards, not unlike that observed on national television between athletes, with no intended or perceived sexual connotation. In short, this isolated and minor incident of questionable conduct will not support a hostile work environment claim.

Perez attempts to bolster her hostile work environment claim by the mosaic of alleged incidents which occurred after the January 10, 2000 incident. Perez claims that her complaint was not investigated, Dahl watched her and took notes, and her co-workers "shunned her and isolated her and perpetuated rumors that she would be demoted." However, none of these claims establish that

10

Perez faced a hostile work environment.

First of all, the actions and rumors from Perez' co-workers are not the type of incidents which create an objectively hostile work environment. "Freedom from 'public humiliation' is not a term, condition or privilege of employment." See Spring v. Sheboygan Area Sch. Dist., 865 F2d 883, 886 (7th Cir. 1989). Secondly, Perez has not shown that NAH failed to investigate her complaint, because of her gender. While Perez claims that NAH did not investigate this incident, her deposition testimony contradicts her claim. In fact, her complaint was investigated, and Byrnes and Dickow met with her on January 28, 2000 to discuss the matter; a meeting which Perez has admitted attending. During this meeting, Perez was told by Byrnes that he did not witness the alleged hitting. Furthermore, Dahl was spoken to and he denied Perez' allegations. Dickow testified that at the end of this meeting Perez stuck to her version of the incident, but thanked him for conducting an investigation. Thirdly, Perez fails to link the allegations that Dahl watched her and took notes to any type of sexual harassment. For example, she does not state that Dahl leered at her. Compare Hilt-Dyson, 282 F.3d at 464 (employee alleged that supervisor stared at her chest). Perez also fails to indicate how many times this behavior is alleged to have occurred. In short, a security guard watching their surroundings fails to evidence a hostile work environment. Lastly, and most damning is that in her deposition, when asked: "Aside from Steve Dahl, was there anyone at the hospital in all the time you worked there who did something hostile and offensive towards you?" Perez indicated: "No." Perez' admission that no one at the hospital did anything hostile and offensive towards her seems to contradict the majority of her claims. It is clear that after the January 28, 2000 meeting that NAH conducted there was never any form of physical contact between Perez and Dahl or any other NAH employees. The meeting was a reasonable response and presumably effective.

In conclusion, Perez has failed to establish her hostile work environment claim.

## 2. Failure to Promote:

Count II of Perez' complaint alleges that she was not promoted to the position of Lieutenant, while another male employee with equal or lesser qualifications was awarded the promotion, in violation of 42 U.S.C. § 2000e-2.

Title VII provides that it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2.

A plaintiff claiming some form of actionable discrimination under Title VII can overcome an employer's motion for summary judgment in one of two manners. "The first is by putting in enough evidence (whether direct or circumstantial) to raise a genuine issue concerning the employer's motivation in carrying out the challenged employment action." Brill v. Lante Corp., 119 F.3d 1266, 1269 (7th Cir. 1997). This direct method is rarely utilized, and is best exemplified by a plaintiff offering "smoking gun" types of evidence, such as admissions or strong circumstantial evidence. See Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1397 (7th Cir. 1997). "The second is the so-called McDonnell-Douglas method, the frequently used burden-shifting framework first set out in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973)." Brill, 119 F.3d at 1270.

Under the McDonnell-Douglas method, in order to make a *prima facie* showing of discrimination in a failure to promote case, Perez must demonstrate that (1) she was a member of a protected group; (2) she applied for and was qualified for the position sought; (3) she was rejected for the position; and (4) those who were promoted had similar or lesser qualifications for the job.

See Ghosh v. Indiana Dept. of Environmental Management, 192 F.3d 1087, 1091 (7th Cir. 1999). If Perez succeeds in establishing a *prima facie* case of discrimination, the burden then shifts to NAH, who must explain why it failed to promote Perez, based on nondiscriminatory reasons. Id. If NAH proffers a nondiscriminatory reason, the burden then shifts back to Perez, who then must demonstrate that NAH's proffered reasons are pretextual. Id. "Pretext is established if the plaintiff can show that the defendant's proffered reasons are either lies or completely lacking in factual basis." Id. (citing Mills v. Health Care Serv. Corp., 171 F.3d 450, 458 (7th Cir. 1999)).

The court now addresses whether Perez' claim of failure to promote can survive a motion for summary judgment. Since Perez has offered no direct evidence of discrimination, her claim must be analyzed under the McDonnell-Douglas burden-shifting framework.

Perez cannot establish a *prima facie* case of discriminatory failure to promote. Perez, a female, certainly is a member of a protected group under Title VII. However, Perez has failed to establish that she applied for the Lieutenant position. Yet this point is the essence of Perez' failure to promote claim - that she was denied the opportunity to apply for the position because it was never posted. The burden-shifting framework is to be applied flexibly, and so the court will further address this element. See Flores v. Preferred Technical Group, 182 F.3d 512, 515 (7th Cir. 1999) (noting that courts must apply the McDonnell-Douglas test flexibly; for example, when an employee concedes that she was not meeting her employer's expectations but claims that she was treated more harshly than other rule-breakers, it makes "little sense in this context to discuss whether she was meeting her employer's reasonable expectations").

Perez alleges that in May and June of 2000 she spoke to Byrnes inquiring about the availability of a prospective Lieutenant position, which Byrnes was in the process of creating. After

these conversations, Byrnes took no further action in regard to creating the Lieutenant position, and resigned his employment with NAH effective June 15, 2000. NAH then reorganized the organizational hierarchy of the Security Department, and changed the duties of the prospective Lieutenant position. The decision regarding the duties of this newly created Lieutenant position was made by Dickow, Toma and the President of NAH, Michael O'Grady. This newly created position was to replace the Director of Security position, and be responsible for general oversight of the Security Department. The Lieutenant position was awarded to Rivera, the only employee to apply for the position, in late June or early July of 2000.

Perez contends that she was not given the opportunity to apply for this position, since it was never made known to her or other employees. In response, NAH contends that it posted this position in the employee cafeteria and the Human Resources office so that employees could view the information and submit applications. NAH's version of events is corroborated by another employee of the Security Department, Princess Johnson ("Johnson"), who testified that the position was posted in the Human Resources office. In addition, Johnson testified that Perez stated that she was not interested in the position. Thus, the evidence indicates that Perez' failure to apply for the position can be attributed only to her, and not to NAH. Therefore, Perez has failed to satisfy the second element of her *prima facie* case.

More significantly, Perez fails to establish that Rivera had similar or lesser qualifications for the position than she did. Rivera had held the position of Sergeant with NAH for a full two years longer than Perez. Perez attempts to bolster her claim by indicating that she had achieved additional training and certification in security-related areas, which Rivera lacked. Perez also indicates that the performance reviews of her and Rivera were essentially identical. However, the fact remains that

14

Rivera had more years of experience in positions of supervision and leadership, both at NAH and another hospital, and the Lieutenant position was essentially a supervisory and leadership position. Therefore, Perez has also failed to satisfy the fourth element of her *prima facie* case.

### 3. Retaliation:

Count III of Perez' complaint alleges that she was retaliated against for reporting Dahl's conduct by receiving false allegations of policy violations and being transferred to another shift under the supervision of a subordinate employee, in effect a demotion.

Title VII prohibits an employer from retaliating against an employee who has "opposed any practice made an unlawful employment practice by this subchapter or . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the statute. See 42 U.S.C. § 2000e-3(a). As with other Title VII claims, a plaintiff seeking to prove such a violation may present either direct or indirect evidence of the employer's intent. See Hilt-Dyson, 282 F.3d at 465. Perez seeks to establish her claim by the indirect burden-shifting method.

Under the indirect methodology, Perez must first present evidence sufficient to establish a *prima facie* case that NAH retaliated against her in violation of Title VII. Id. In this case, a *prima facie* case is established if Perez can demonstrate that: (1) she engaged in statutorily protected activity; (2) she performed her job according to NAH's legitimate expectations; (3) despite meeting NAH's legitimate expectations, she suffered a materially adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. Id.; see also Stone v. City of Indianapolis Pub. Util. Div., 281 F.3d 640, 644 (7th Cir. 2002). If Perez fails to establish any element of the *prima facie* case, her retaliation claim fails and cannot survive summary judgment. Id. If, on the other hand, Perez establishes a *prima facie*

case, a presumption of discrimination has been established; the burden of production then shifts to NAH, who must offer a nondiscriminatory reason for the adverse employment action. Id. Should NAH offer a nondiscriminatory reason for the adverse employment action, the presumption of discrimination has been rebutted; the burden of production then shifts back to Perez to demonstrate the pretextual nature of the proffered reason. Id. "At this point, if the employee fails to establish pretext, her retaliation claim cannot survive summary judgment." Id.

Perez' retaliation claim may be easily disposed of based solely on the lack of temporal proximity between the reporting of the alleged sexual harassment and the alleged retaliation. Perez reported Dahl's conduct to Byrnes and Dickow in January of 2000. The false allegations of policy violations and transfer to another shift under the supervision of a subordinate employee, which she contends are retaliatory acts, occurred in late July of 2000. "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (citing Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (4-month period insufficient)). Thus, the six month gap between the protected activity and the allegedly adverse employment actions militate against a finding of retaliation.

Additionally, Perez' retaliation claim fails because she cannot establish a *prima facie* case of retaliation. Perez cannot establish the second element of her *prima facie* case, that she performed her job according to NAH's legitimate expectations. What Perez argues are false allegations of policy violations stem from a meeting she had with Rivera on July 27, 2000. On that date, Rivera and Perez discussed a number of concerns that he had with her performance. Rivera documented

16

these concerns in a memo, which the two reviewed. Specifically, this memo set forth a list of instances of Perez' poor performance, including: "excessive tardiness; leaving her shift before time; threatening some night shift officers to go to court for a certain incident; not responding to the pager when called upon during an emergency; no discipline for attendance and punctuality; no Accutech system check done in PM shift; no frequent check on 1121 and 1029 building alarm system; poor scheduling of man power; scheduled herself off during Puerto Rican parade no supervision in charge; driving the Jeep with head lights off during the night; no daily activity sheets for ex-employee Jiminez; visitor passes left in lobby area unattended after 2130 hours; not refueling Jeep at end of day; not being familiar with the location when fire alarm system activates; supervisor keys not given to next shift at end of day, resulted in lost keys; no home number given, in case of emergency." Rivera testified that he had these concerns based on his observations of Perez while he was a Sergeant.

However, as with other contradictions in her allegations, what Perez argues are false allegations of policy violations are in reality undisputed facts. In her deposition, Perez testified that she had left work before the end of her shift; she did not respond to a pager during an emergency; she drove the security Jeep from one parking lot to another without the head lights on while it was dark; and that she did not refuel the Jeep at the end of the day if she was busy. In addition, as to Rivera's allegation of excessive tardiness, when asked whether Perez was late for work, Johnson testified: "She would be late a lot of times." Furthermore, in regard to the remainder of Rivera's allegations, Perez simply denies them in a conclusory manner and fails to offer any proof to support those denials. Therefore, Perez cannot establish the second element of her *prima facie* case, that she performed her job according to NAH's legitimate expectations, because Perez admits that she

17

committed a number, but not all sixteen, of the infractions listed in Rivera's memo.

In addition, Perez cannot establish the third element of her *prima facie* case, that she suffered a materially adverse employment action. A materially adverse employment action is "more than a mere inconvenience or an alteration of job responsibilities." Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993). The Seventh Circuit has indicated:

> "Although creating a precise list of activities that constitute adverse employment actions would be impossible because of the unique circumstances of individual cases, we have indicated that materially adverse actions may include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'"

Hilt-Dyson, 282 F.3d at 466 (citing Ribando v. United Airlines, Inc., 200 F.3d 507, 510 (7th Cir. 1999)).

Perez attempts to establish an adverse employment action by arguing that she received false allegations of policy violations and was transferred to another shift under the supervision of a subordinate employee, which was in effect a demotion. As just indicated, the allegation that she received false allegations of policy violations is unsubstantiated. However, Rivera's memo does not evidence an adverse employment action. "Standing alone, a letter of concern or counseling . . . does not rise to the level of an adverse employment action." Ribando, 200 F.3d at 511.

As a result of this meeting at which these problems were discussed, Rivera determined that Perez would be transferred to the night shift. Perez retained her title as Sergeant and performed substantially the same duties as she had performed on her previous shift. In addition, Perez did not receive a reduction in salary. Yet, Perez argues that Rivera transferred her because he knew that it would adversely affect her, due to family obligations.

18

Whether a change in an employee's working conditions has been materially adverse is a question of fact, which may be resolved on summary judgment only if the question is not fairly contestable. See Williams v. Bristol-Myers Squib Co., 85 F.3d 270, 273 (7th Cir. 1996). "Obviously a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." Id. at 274. "A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either." Id.

In Williams, an employee was transferred to another sales territory and placed in a coaching program, in order to survey the employee's performance. Id. at 272. The Seventh Circuit held that this transfer and placement in a coaching program did not rise to level of materially adverse employment action. Id.

In the present case, Perez' transfer is virtually indistinguishable from the "coaching program" the employee was transferred to in Williams. Rivera decided to transfer Perez to the night shift because the shift that Perez had supervised, the P.M. shift, had the most problems. Rivera also transferred Perez so that she could improve her performance. Perez characterizes the transfer to the night shift as a demotion, because she was under the supervision of another Sergeant, Facundo Allere ("Allere") and a Corporal, Frank Gonzalez ("Gonzalez"). However, Perez was not under the supervision of Sergeant Allere or Corporal Gonzalez in a hierarchical sense; rather, she worked closely with the officers on the night shift so that she could become acclimated to the procedures of that shift. During this time, Perez retained her title as Sergeant and performed substantially the same duties as she had performed on her previous shift. Furthermore, once this acclimation occurred, Perez was the only Sergeant in the night shift; however, she resigned shortly thereafter. Thus, it

cannot be argued that Perez suffered "significantly diminished material responsibilities." Hilt-Dyson, 282 F.3d at 466 (citing Ribando, 200 F.3d at 510).

Perez also attempts to establish an adverse employment action by arguing that she was constructively discharged. Perez seeks to establish this claim by repeating the incidents of which she complains in a blunderbuss fashion, arguing that the totality of the circumstances establish that she was constructively discharged. In order to establish a constructive discharge claim, a plaintiff must show that their working conditions were so intolerable as to force resignation involuntarily. See Harriston v. Chicago Tribune Co., 992 F.2d 697, 705 (7th Cir. 1993). Absent extraordinary circumstances, a complaining employee is expected to remain on the job while seeking redress. Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1015 (7th Cir. 1997).

As indicated earlier, none of these alleged incidents, individually or collectively, establish an adverse employment action. Perez resigned her employment with NAH voluntarily. While Perez may have subjectively believed that these incidents were so severe that she had no option other than to resign, the fact remains that these subjective beliefs amount to no more than speculation. "Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." Tyler v. Runyon, 70 F.3d 458, 469 (7th Cir. 1995).

### 4. Pendent Claims:

Having concluded that Perez' federal claims cannot survive a motion for summary judgment, the court declines to exercise supplemental jurisdiction over her state law intentional battery and intentional infliction of emotional distress claims. See 28 U.S.C. § 1367(c); see also Van Harken v. City of Chicago, 103 F.3d 1346, 1354 (7th Cir.1997) ("The general rule is that when as here the

federal claim drops out before trial . . . the federal district court should relinquish jurisdiction over the supplemental claim.")

## III. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted as to Counts I - III, and the court declines to exercise supplemental jurisdiction over Counts IV - V.

IT IS SO ORDERED.

ENTER: _Charles R Norgle_
CHARLES R. NORGLE, SR.
Judge United States District Court

DATED: _2-4-03_